**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DWIGHT WHETSTONE,** | : | **CIVIL NO. 3:08-CV-2306** |
| | : | |
| **Plaintiff,** | : | **(Judge Kosik)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **STANLEY BOHINSKI, D.O., et. al,** | : | |
| | : | |
| **Defendants,** | : | |

## REPORT AND RECOMMENDATION

### I.    Statement of Facts and of the Case

#### A.    Introduction

This case, which comes before the Court for consideration of a motion for summary judgment, presents a striking example of the challenges faced by inmates and corrections medical personnel in trying to address the medical needs of a physically active prison population. The Plaintiff in this case, Dwight Whetstone, is one such physically active inmate. Indeed, in this case we are called upon to determine whether the Defendants' medical treatment of a shoulder injury suffered by the Plaintiff when he was attempting to bench press 400 pounds rises to the level of deliberate indifference to his serious medical needs. Finding that this on-going course of medical care, which included treatment, surgery, consultation with outside physicians, and a program of physical therapy, does not rise to the level of deliberate

indifference to serious medical needs we recommend that the Defendants' motions for summary judgment (Docs. 78 and 82 ) be granted.

### B.    The History of Inmate Whetstone's Medical Treatment

This inmate medical claim arises out of an episode of strenuous, voluntary physical activity undertaken by a state prisoner on New Year's Eve. On December 31, 2006, the Plaintiff, Dwight Whetstone, was a state inmate housed at the State Correctional Institution (SCI) Dallas.  On that date, Whetstone was lifting weights in the prison gym, when he  attempted to bench press approximately 400 pounds. (Doc. 80. Ex. B at 18.) As he attempted this lift, Whetstone experienced a "grinding and rolling of muscle in his chest and upper arm area." (Doc. 1, ¶ 11.)

Having experienced this injury, at approximately 6:30 p.m. on December 31, 2006, Whetstone reported to the prison infirmary where the Defendant, Nurse Evelyn Smith, was on-duty. (Doc. 80, Appendix Exhibit "A").Whetstone's appearance at the infirmary at approximately 6:30 p.m. on New Years Eve was unusual and he arrived at this facility after the normal sick call hours. (Doc. 80. Ex.B, p. 22, lines 3-6, p. 23, lines 14-16.) Despite the fact, that he arrived after hours, on the New Year's Eve holiday evening, Whetstone was promptly seen by the Nurse Smith. (Id.)

When Whetstone appeared at the infirmary he complained to Smith of pain and tingling to the left upper breast area of his chest, stating that he had been bench

pressing weights when he felt something "pop." (Doc. 80, Ex A.)[1] Smith examined Whetstone's area of alleged discomfort by feeling the left upper breast area, and she did not see or feel any redness, deformity, tightness, or edema.(Doc. 80, Appendix Exhibit "A") Nurse Smith documented this examination of Whetstone on a DC-457, Medical Incident/Injury Report, that she completed on December 31, 2006, (Doc. 80, Appendix Exhibit "A", Appendix Exhibit "A-I" Medical Incident/Injury Report, Appendix Exhibit "C"), and recorded this examination in her nursing Progress Note for December 31, 2006.(Id. Appendix Exhibit "A-2" Progress Note for December 31, 2006, Appendix Exhibit "C").

Examining Whetstone, Nurse Smith also took his vital signs, including his blood pressure, heart rate, and respiration. (Id. Appendix Exhibit "A"; Appendix Exhibit "A-I" Medical Incident/Injury Report; and Appendix Exhibit "A-2" Progress Note for December 31, 2006). Nurse Smith then gave Whetstone 400 m.g. of Motrin®, a non-prescription analgesic pain-reliever for his discomfort along with an ice-pack with iodine. (Doc. 80, Ex B, p. 28 ; Appendix Exhibit "A"; Appendix Exhibit "A-I" Medical Incident/Injury Report); and Appendix Exhibit "A-2" Progress Note for December 31, 2006).

_____

[1] Whetstone and Smith dispute whether Smith told Whetstone to return to his cell when he first reported to the infirmary. While this fact is in dispute, in light of the care provided by Smith to Whetstone on December 31, 2006 we find that this dispute is not material to the resolution of this case.

While Nurse Smith's initial examination of Whetstone led her to conclude that it was not necessary to call 911 or refer Whetstone to a local hospital emergency room, (Doc. 80, Appendix Exhibit "A"), the first blood pressure reading Nurse Smith received for Whetstone revealed an elevated blood pressure, 162/120. Accordingly, Nurse Smith performed a second blood pressure test which confirmed Whetstone's elevated blood pressure, recording a heightened blood pressure of 170/120. (Id. Appendix Exhibit "A", 15, 16; Appendix Exhibit "A-I" Medical Incident/Injury Report; and Appendix Exhibit "A-2" Progress Note for December 31, 2006).

Having identified this medical concern, Nurse Smith acted with dispatch. Within approximately fifteen minutes of Whetstone's appearance at the infirmary, at 6:45 p.m. on December 31, 2006, Nurse Smith, contacted Dr. Bohinski to advise him of Whetstone's injuries, his complaints regarding his injury, Smith's examination of Whetstone, and Whetstone's elevated blood pressure. (Doc. 80 Appendix Exhibit "A", 17; Appendix Exhibit "A-I" Medical Incident/Injury Report; and Appendix Exhibit "A-2" Progress Note for December 31, 2006).

Dr. Bohinski, in turn, immediately prescribed a course of treatment for Whetstone, ordering that Whetstone be placed on overnight observation to rest, that he be given 0.1 mg of Catapres® for his elevated blood pressure, that his blood pressure be rechecked in one hour, and that he receive additional blood pressure medications if his systolic blood pressure was greater than 180 or the diastolic blood

pressure was greater than 100.(Doc. 80, Appendix Exhibit "A" 18; Appendix Exhibit "A-3" Physician's Order for December 31, 2006). Dr. Bohinski also confirmed Nurse Smith's initial clinical impressions, since he did not order that 911 be called or that Whetstone be referred to a local hospital. Nor did Dr. Bohinski order a prescription pain medication for Whetstone or prescribe any other measures for Whetstone. (Doc. 80, Appendix Exhibit "A" 19; Appendix Exhibit "A-3" Physician's Order for December 31, 2006).These instructions from Dr. Bohinski largely defined the scope of Nurse Smith's discretion on the evening of December 31, 2006, since as a Registered Nurse, Smith cannot administer a prescription drug to a patient or prescribe a brace for a patient without a physician order and prescription. See 63 P.S. § 212 and 49 Pa Code § 21.11, *et. seq.*

Following the care guidance she had received from Dr. Bohinski, Nurse Smith gave Whetstone the initial dose of 0.1 mg of Catapres® for his elevated blood pressure. (Doc. 80, Appendix Exhibit "A" , 20; Appendix Exhibit "A-4" Medication Administration Record for December 31, 2006). Several hours later, at 7:55 p.m. on December 31, 2006, Nurse Smith followed up on her medical instructions and checked Whetstone's blood pressure once again. Finding that Whetstone's blood pressure reading was still elevated, at 162/120, in accordance with Dr. Bohinski's orders, Nurse Smith administered a second 0.1 mg dose of Catapres® to Whetstone who remained

in the infirmary overnight, where he was seen by Dr. Bohinski the next day.(Doc. 80, Appendix Exhibit "B", p. 25, 1. 24-25; p. 26, 1. 1-9.)

This care provided by Nurse Smith, which consisted of examination and treatment of Whetstone throughout the evening hours of December 31, 2006, coupled with consultation with Whetstone's treating prison physician, Dr. Bohinski, constitutes the totality of the conduct that Whetstone alleges demonstrated deliberate indifference by this Defendant to his serious medical needs.

Over the following year, Whetstone received on-going medical care from the other Defendants, Drs. Bohinski and Stanish, as well as numerous other care-givers. This course of treatment for Whetstone' shoulder injury began on the day after that injury, January 1, 2007, when Dr. Bohinski saw Whetstone and ordered an x-ray because Whetstone was complaining of pain in his shoulder. (Doc. 85, Exhibit "E", p. 110.) On January 1, 2007, Dr. Bohinski also placed Whetstone on medical restrictions and limited his yard and sports activities, as well as his work assignments. (Id. Exhibit "E", p. 56.)

The following day, January 2, 2007, Whetstone was seen by Dr. Stanish, whose examination of Whetstone led him to suspect that the Plaintiff had suffered a muscle tear. Accordingly, Dr. Stanish immediately ordered that Whetstone be referred to an orthopedist. (Id., Exhibit "E", pages 56 and 110.) That orthopedic consult occurred within one week, on January 7, 2007. In this January 7 examination the orthopedist

found that Whetstone was experiencing left chest and bicep tenderness, and recommended an MRI to determine whether Whetstone had suffered a muscle tear. (Id. Exhibit "E", p. 144.)

Two days later, on January 9, 2007, Dr. Stanish ordered an MRI of Whetstone's left shoulder and chest for possible bicep rupture and pectoralis major rupture. (Id., Exhibit "E", pages 57 and 145.), Whetstone underwent this MRI of his left shoulder and chest, on January 26, 2007. The results of the MRI revealed a probable complete disruption of Whetstone's pectoralis muscle, combined with large fluid collection, shoulder degeneration and tear, and probable perforation of a shoulder tendon. (Id., Exhibit "E", p. 46.) Having conducted these tests and secured this initial diagnosis, physicians continued to actively treat Whetstone, ordering Tylenol for thirty days as well as a scheduling a consult with a specialist and surgeon, Dr. Girton. (Id., Exhibit "E", p. 57.)

Whetstone was seen by Dr. Girton on February 27, 2007. Following an examination of Whetstone, Dr. Girton recommended surgery to repair the perforated shoulder tendon. (Id., Exhibit "E", p. 146.) Two months later, on April 11, 2007, Whetstone underwent surgery performed by Dr. Girton at St. Catherine's Medical Center. (Id., Exhibit "E", p. 119.)

Following this surgery, the Defendants continued to actively treat and care for Whetstone. Thus, on May 21, 2007, Wheatstone was seen by Dr. Stanish, who ordered

another telemedicine conference with Dr. Girton to discuss Whetstone's condition and recovery. (Id., Exhibit "E", pages 68 and 125.) This second surgical, post-operative consult took place on June 1, 2007, when Dr. Stanish had a telemedicine conference with Dr. Girton. During this consult, Dr. Girton indicated that, in the course of Whetstone's surgery, it was necessary for the doctor to suture muscle to muscle because the rupture did not involve the tendon. After reviewing Whetstone's progress, Dr. Girton's initial clinical impressions were that the surgery may not have been successful and the doctor suggested that perhaps scar tissue should be permitted to form before any further medical review took place. (Id., Exhibit "E", p. 125.)

On September 20, 2007, the Defendants conducted another telemedicine conference with Dr. Girton. At this time, Dr. Girton discussed a number of medical options and recommended exploration of the surgical site but indicated there was a significant risk of limited functional ability and re-rupture. (Id., Exhibit "E", p. 154.)

Following his consultation, on October 9, 2007, Whetstone was placed on restrictions, including limitations regarding sports, weight lifting, working around machines or lifting heavy objects, and given bottom bunk status. All of these measures were taken in an effort to facilitate his healing and recovery.(Id., Exhibit "E", p. 74.) Furthermore, on October 12, 2007, medical staff decided that an alterative treatment, physical therapy, was the best method course of treatment for Whetstone. In reaching this conclusion medical personnel considered additional surgery for Whetstone but

concluded that surgery was not medically necessary, and that there was a significant risk of failure, according to the surgeon , Dr. Girton.(Id., Exhibit "E", pages 69,156, 159.) Assessing these risks and benefits, the doctors exercised their medical judgment in favor of a less invasive program of treatment. (Id.) Once this judgment was reached, the medical department notified Whetstone that they had determined that a second surgery was not advisable and that he could be successfully treated with physical therapy. Whetstone disagreed with this decision. (Id., Exhibit "F", p. 108, lines 13-21.)

Having made this medical judgment, the Defendants promptly scheduled physical therapy for Whetstone, on October 12, 2007. (Id., Exhibit "E", p. 69.). On October 17, 2007, Whetstone was seen by a physical therapist and given exercises to perform. (Id., Exhibit "E", p. 129.) Nine days later, on October 26, 2007, Whetstone was reevaluated by a physical therapist.(Id., Exhibit "E", p. 77.) This physical therapy treatment continued through 2008, with Whetstone seeing the therapist on July 2, 2008 and December 4, 2008. During these physical therapy sessions, medical personnel suggested that Whetstone use light weights when performing the exercises, (Id., Exhibit "E", p. 135), and Whetstone was counseled about exercises and the use of light weights. (Id., Exhibit "E", pp. 40 and 74.)

## C.    **Procedural History**

Dissatisfied with these medical outcomes Whetstone filed this action in federal court in 2008. (Doc. 1.) From the outset, Whetstone's complaint acknowledged that he has received on-going health care from prison medical staff. (Id.) While conceding this care, Whetstone has focused on a single narrow issue, the decision to forego a second shoulder surgery to address his injuries. Thus, the gravamen of Whetstone's complaint is that this choice of treatment reflected such profound deliberate indifference to his medical needs that it rose to the level of cruel and unusual punishment forbidden under the Eighth Amendment to the Constitution.

After extensive litigation, this issue has been squarely joined in summary judgment motions filed by all Defendants. These motions are supported by hundreds of pages of testimony, declarations and medical records. The motions have been fully briefed by the parties, and are now ripe for resolution.

For the reasons set forth below, it is recommended that the Defendants' motions for summary judgment should be granted.

## II.    **Discussion**

### A.    **Rule 56– The Legal Standard.**

The Defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and

any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477

U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

**B.** **Legal Standards Governing Eighth Amendment "Deliberate Indifference" Claims in a Prison Medical Context.**

In this case, the gravamen of Whetstone's complaint is that prison officials violated his rights under the Eighth Amendment to the United States Constitution by displaying "deliberate indifference" to his medical needs. Whetstone faces an exacting burden in advancing this Eighth Amendment claim against prison officials in their individual capacities. To sustain such a claim, Whetstone must:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 105 (1976). To establish a violation of his constitutional right to adequate medical care in a prison setting, Whetstone is required to point to evidence that demonstrates both (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or by "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth

Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997).

Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can

be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F.App'x. at 197-198 (citations omitted).

In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is typically disavowed by courts since such determinations remain a question of sound professional medical

judgment. Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).

Furthermore, it is well-settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim. See Taylor v. Norris, 36 Fed. Appx. 228, 229 (8th Cir.2002) (deliberate indifference claim failed when it boiled down to a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1024-35 (7th Cir.1996) (inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); Sherrer v. Stephen, 50 F.3d 496, 497 (8th Cir.1994) (inmate's "desire for a replacement joint instead of fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim"); Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir.1994) (prison provided escalating level of treatment for inmates's ailments over time, and inmate's disagreement with course of medical treatment was insufficient basis for Eighth Amendment violation); Czajka v. Caspari, 995 F.2d 870, 871 (8th Cir.1993) (inmate's mere disagreement with doctor's informed decision to delay surgery does not establish Eighth Amendment claim); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir.1990) (inmate failed to prove deliberate indifference where his complaints represented

nothing more than mere disagreement with course of his medical treatment); Lair v. Oglesby, 859 F.2d 605, 606 (8th Cir.1988) (disagreement about whether doctor should have prescribed medication does not result in constitutional violation); Martin v. Sargent, 780 F.2d 1334, 1339 (8th Cir.1985) (Inmate failed to state facts indicating doctor deliberately disregarded his medical problem; inmate's disagreement as to proper medical treatment does not give rise to Eighth Amendment violation). Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as a constitutional claim under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference." Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997)(citations omitted).

### C. Whetstone Has Failed to Establish An Eighth Amendment "Deliberate Indifference" Claim in a Prison Medical Context.

In this case, judged against these exacting standards, it is evident that Whetstone has not met the legal and factual threshold necessary to sustain an Eighth Amendment claim of deliberate indifference to his serious medical needs. Therefore, it is recommended that the Court find that the Defendants are entitled to summary judgment on this Eighth Amendment claim.

At the outset, it is entirely undisputed that the Plaintiff received extensive, on-going medical treatment for this shoulder injury over the span of two years. During

this time Whetstone was examined and treated on numerous occasions. He received a wide array of treatments including medications, MRI tests, orthopedic and surgical consults, surgery, and physical therapy. These treatments were designed to address the shoulder injury, and permit Whetstone to return to an active, physical lifestyle. Numerous health care professionals committed their time and talents to this treatment, meeting with Whetstone, performing tests, evaluating test results, engaging in shoulder surgery, counseling and caring for him. Indeed, Whetstone was provided with a medical consultation with both a surgeon and an orthopedist, in an effort to address his needs. All of this on-going care is undisputed in the factual record, and is fatal to Whetstone's claim that these health care professionals have been deliberate indifferent to his medical needs since "the exercise by a doctor of his professional judgment is never deliberate indifference. See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997).

In particular, Whetstone cannot sustain an Eighth Amendment deliberate indifference claim against Nurse Smith, who first cared for him on the evening of his shoulder injury. Whetstone's complaints notwithstanding, the undisputed evidence shows that at approximately 6:30 p.m. on December 31, 2006, Whetstone reported to

the prison infirmary, arriving at this facility after the normal sick call hours. Despite the fact that he arrived after hours, on the New Year's Eve holiday, Whetstone was promptly seen by Nurse Smith, who documented that Whetstone was complaining of pain and tingling to the left upper breast area of his chest, stating that he had been bench pressing weights when he felt something "pop." Smith immediately examined Whetstone by feeling the left upper breast area, and she did not see or feel any redness, deformity, tightness, or edema. Nurse Smith also took Whetstone's vital signs, including his blood pressure, heart rate, and respiration, gave Whetstone 400 m.g. of Motrin®, a non-prescription drug, for his discomfort and administered an ice-pack with iodine. While Nurse Smith's initial examination of Whetstone led her to conclude that it was not necessary to call 911 or refer Whetstone to a local hospital emergency room, the first blood pressure reading for Whetstone revealed an elevated blood pressure. Accordingly, Nurse Smith performed a second blood pressure test which confirmed Whetstone's elevated blood pressure.

Having identified this medical concern Nurse Smith acted with dispatch, contacting Dr. Bohinski within approximately fifteen minutes of Whetstone's appearance at the infirmary, at 6:45 p.m. on December 31, 2006. Dr. Bohinski, in turn, immediately prescribed a course of treatment for Whetstone, ordering that he be placed on overnight observation to rest, that he be given medication for his elevated

blood pressure, that his blood pressure be rechecked in one hour, and that he receive additional blood pressure medications if his blood pressure remained elevated. These instructions from Dr. Bohinski defined the scope of Nurse Smith's discretion on December 31, 2006, since as a Registered Nurse, Smith cannot administer a prescription drug to a patient or prescribe a brace for a patient without a physician order and prescription. Moreover, on December 31, 2006, Nurse Smith faithfully followed the care guidance she had received from Dr. Bohinski, giving Whetstone an initial dose of blood pressure medication and several hours later, after checking Whetstone's blood pressure and finding that Whetstone's blood pressure reading was still elevated, administering a second dose of blood pressure medication to Whetstone.

On these essentially undisputed facts it cannot be said that Nurse Smith was deliberately indifferent to Whetstone's medical needs. Quite the contrary, the care provided by Nurse Smith, which included examination and treatment of Whetstone throughout the evening hours of December 31, 2006, coupled with consultation with Whetstone's treating prison physician, Dr. Bohinski, thoroughly rebuts any claim of deliberate indifference by this Defendant to Whetstone's serious medical needs. Furthermore, while Whetstone and Smith dispute whether Smith told Whetstone to return to his cell when he first reported to the infirmary on December 31, 2006, the true measure of the care Whetstone received is not found in what the Plaintiff claims

Nurse Smith first said when he arrived, after hours, at the infirmary. Rather, it is measured by Nurse Smith's actions in addressing his medical needs. Judged by these actions, Nurse Smith clearly provided prompt, timely and appropriate care to Whetstone, working in consultation with Dr. Bohinski. Since the provision of medical services and "the exercise . . . of . . professional judgment is never deliberate indifference" these actions defeat an Eighth Amendment claim against this Defendant. Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997)(citations omitted).

As for the remaining Defendants, Drs. Stanish and Bohinski, Whetstone in his pleadings seems to concede that he received on-going medical care from these doctors, a concession that defeats this Eighth Amendment claim. Because the longstanding course of this treatment thoroughly rebuts any claim of deliberate indifference to his medical needs, Whetstone is reduced in his pleadings to contesting one specific aspect of this treatment–the decision in October 2007 to forego a second shoulder surgery and treat his injury in a less invasive fashion through a program of physical therapy. Thus, stripped to its essentials, as to these doctors, Whetstone's claim is not that he was denied or deprived treatment. Rather, it is simply a dispute between an inmate and his health care providers over the precise nature of this treatment; a dispute that turns on a difference of opinion regarding the efficacy of alternate treatment programs.

As a legal matter disputes between inmates and medical professionals concerning which of several available medical options to use in treating a specific medical problem simply do not rise to the level of a constitutional infraction involving deliberate indifference to a serious medical need. Indeed, courts have repeatedly held that when an inmate's Eighth Amendment claim entails nothing more than a disagreement concerning which type of treatment to prescribe for a particular ailment, prison officials are entitled to a judgment in their favor as a matter of law. See e.g., Gause v. Diguglielmo, 339 F.App'x 132 (3d Cir. 2009)(dispute over choice of medication does not rise to the level of an Eighth Amendment violation); Innis v. Wilson, 334 F.App'x 454 (3d Cir. 2009)(same); Rozzelle v. Rossi, 307 F.App'x 640 (3d Cir. 2008)(same); Whooten v. Bussanich, 248 F.App'x 324 (3d Cir. 2007)(same); Ascenzi v. Diaz, 247 F.App'x 390 (3d Cir. 2007)(same).[2]

---

[2]While Whetstone does not contest in any material way the medical reasons advanced by the Defendants for their choice of treatment in his case, he suggests that he did not receive a second surgery, in part, due to financial considerations. The Defendants dispute that financial considerations played any role in their decision, but we find that the dispute over this issue is not material in this case where health care providers undeniably also had medical reasons for making their drug treatment choices. In this regard, we note that the Eighth Amendment does not require a prison to provide an inmate "with the most sophisticated care money can buy." United States v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987). Nor are prison medical officials required to be blind to assessing the risks and costs of various treatment options. Furthermore, it is also clear that a dispute regarding whether doctors erred in this cost-benefit assessment, which is the essence of the medical art, sounds in negligence only and may not be cast as a constitutional violation. Thus, it is well-settled that an allegation of "mere malpractice of

Thus, in its present posture, Whetstone's Eighth Amendment claims should be dismissed since those:

> [A]llegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F.App'x. at 197-198.(citations omitted).

---

medicine in prison does not amount to an Eighth Amendment violation. This principle may cover. . .[an allegedly] erroneous calculus of risks and costs. . . ." Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir. 2000).Therefore, in a case such as this, where doctors are making medical judgments between alternate approved treatment options, they do not violate the constitution if those judgments assess both the risks and the costs of the competing options. Indeed, this Court has recently rejected precisely this type of Eighth Amendment claim premised on allegations that doctor's cost-benefit analysis in a prison context rose to the level of a constitutional violation, stating that; "even taking Plaintiff's allegation as true- that [the prison doctor] had a policy of withholding medical treatment due to cost- Plaintiff has still failed to state a cause of action under the Eighth Amendment. Plaintiff was not denied medical treatment, he simply did not receive the specific treatment he requested. . . . Defendants' conduct was not wanton or deliberately indifferent." Winslow v. Prison Health Services, Inc. No. 08-785, 2010 WL 571766, 6 (M.D.Pa. Feb. 12, 2010).

## III. Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the Defendants' motions for summary judgment (Docs. 78 and 82) be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions

Submitted this 11th day of June, 2010.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge